**Opinion issued July 22, 2021**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-20-00304-CR

———————————

## JASON ROCHE, Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from the 403rd District Court
Travis County, Texas[1]
Trial Court Case No. D-1-DC-20-904002

## MEMORANDUM OPINION

Appellant, Jason Roche, killed Devonte Ortiz by shooting him with a firearm.

Roche admitted to killing Ortiz but claimed he had done so because he reasonably

---

[1] The Supreme Court of Texas transferred this appeal from the Court of Appeals for the Third District of Texas to this Court. *See* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases between courts of appeals).

believed that such force was immediately necessary to protect his father against Ortiz's attempted use of deadly force. The jury rejected Roche's defensive theory, finding Roche guilty of the offense of murder. The jury assessed Roche's punishment at 43 years in prison. In two issues, Roche contends that the evidence was legally insufficient to uphold his murder conviction, and he asserts that the trial court abused its discretion by admitting evidence during the punishment phase of his affiliation with a motorcycle gang.

We affirm.

## Background

Nineteen-year-old Devonte Ortiz lived with his mother and younger sister in the Pleasant Hill Apartments in Austin, Texas. Around midnight on July 4, 2018, Ortiz was joined by four friends—P. Mendoza, L. Tirado, V. Hargrove, and B. Vindou—in the parking lot of the apartment complex to shoot fireworks in celebration of Independence Day. Mendoza had driven to the apartment complex in his Nissan Maxima, and the group of friends was gathered around the car as they shot the fireworks.

Jason Roche did not live in the apartment complex, but he was there that night visiting his 67-year-old father, Dennis, who lived in the complex. Dennis had a service dog, and Roche testified at trial that the fireworks were upsetting the dog. Roche confronted Ortiz and his friends and told them to stop shooting the fireworks.

Ortiz's friends testified that Roche did not ask them to stop in a polite manner; rather, Roche was yelling and rude to them. Roche called them "monkeys," which they understood to be a racial slur. Roche said that if they did not stop shooting fireworks then they would "see what happens." In turn, Ortiz and his friends responded verbally to Roche in an angry and aggressive manner, but no physical altercation occurred at that point.

Roche went back to his father's apartment, and Ortiz and his friends continued shooting fireworks. After about ten minutes, Roche returned to confront the group again. The first time he had approached the group, Roche had been dressed casually, wearing athletic shorts. When he came out the second time, Roche had changed clothes. He was wearing boots, pants, and a black t-shirt. He was also wearing a holster containing a handgun on his hip. As he walked toward the group, Roche appeared angry.

Ortiz and his friends were standing by the passenger side of the Maxima. Roche walked directly up to Ortiz and, according to the trial testimony of Ortiz's friends, either grabbed or punched Ortiz, and Ortiz swung at Roche. In the scuffle, Roche tore Ortiz's shirt off his body. Ortiz's friends stepped forward to help him, and Roche pulled his gun from its holster and pointed it at the group. Roche held the gun to Vindou's forehead and told him, "If you take another step I will shoot, you black son of a bitch." Roche then pointed the gun at each of the young men as they

stood lined up beside the Maxima. Roche then holstered his firearm. Roche started walking away from the group, and he again called Ortiz a "monkey."

Mendoza had two unloaded firearms in the Maxima. Ortiz grabbed one of the firearms from the vehicle as Roche walked away from the group. Ortiz did not point the gun at Roche, but seeing that Ortiz had a gun, Roche again removed his gun from its holster and approached the group. Roche told Ortiz to drop his gun. Ortiz complied, laying the gun on the ground on the driver's side of the vehicle near the front tire. Roche again began walking away from the group with Ortiz calling Roche a coward because he will not fight without a gun.

Tirado and Vindou had been videoing the altercation with their cell phones. Ortiz can be heard in one of the videos shouting to Roche's father, Dennis: "Come get your son before he gets killed, Mr. Dennis." Roche appeared to think that Ortiz had just verbally threatened his father because he asked Ortiz, "Did you just threaten my dad?" Roche walked quickly back to the group with his gun drawn. Ortiz tried to clarify that he had told Dennis to come get Roche and had not threatened Dennis. Roche then pushed Ortiz and chased Ortiz around the Maxima, asking him why he was running.

Dennis then approached the group telling them "to break it up." As Dennis approached the group, Roche pointed his gun at Ortiz's head. Ortiz asked Dennis if he would let his son (Roche) kill him and "go to jail for life." Dennis walked up to

4

Ortiz and pushed him, saying "get the fuck out of my face." Ortiz then put his arm up to keep Dennis away, who continued to get closer and closer to him. Ortiz told Dennis, "Y'all will definitely be kicked out of the apartments by Monday." The cell phone videos show Dennis and Ortiz face-to-face, with Dennis putting his hands in Ortiz's face and pushing Ortiz out of frame of the cell phone videos.

Ortiz and Dennis were in the area near the back end of the Maxima on the driver's side. Ortiz's friends and a neighbor testified that they saw Dennis grab Ortiz around the neck. Ortiz pushed Dennis, who lost his balance and fell to the ground. The cell phone videos show Roche turn toward Ortiz, take two steps forward, raise his firearm, and shoot. Ortiz was outside the frame of the video at the time, but it is undisputed that Roche shot Ortiz in the chest.

Before he was shot, Ortiz can be heard yelling, "This [N-word] [referring to Dennis as the N-word] just choked . . . ." Ortiz's statement was then abruptly cut off by Roche firing his gun. The videos show that about two to three seconds had elapsed between Dennis falling and Roche shooting Ortiz. Ortiz's friends testified that, after Ortiz pushed Dennis, Ortiz had turned to his left, and was trying to run away from Roche when he was shot.

After he was shot, Ortiz fell to the ground at the back of the Maxima on the driver's side. Dennis got up from the ground and went to Ortiz to provide first aid. Ortiz's mother had been informed, and she arrived to help her son. A neighbor, Nina,

5

who had witnessed the shooting, had already called 9-1-1. When paramedics arrived, Ortiz did not have a pulse and attempts to resuscitate him failed.

Roche also called 9-1-1. During the call, Roche shouts, "Don't push my dad. That's how this happened." After police arrived at the scene, Roche was taken into custody. He gave a statement to an officer at the scene, which was recorded on the officer's body camera. Roche told the officer that the second time he approached Ortiz and his friends, after they had continued to shoot the fireworks, he had gone "over there to fight the [N-word]," meaning he went over to fight Ortiz.

With respect to describing the events leading up to the shooting, Roche told the officer that Ortiz "fucking hit [my dad]." He described the hit as a "hook," "headbutt," or "a punch." He said, "My dad went down, like this, hit his fucking head, and that's when I shot [Ortiz]."

Roche was taken to the police station where he gave a videotaped interview to a detective. During the interview, Roche told the detective that Ortiz had hit or headbutted his father. He saw his father fall and hit his head on the concrete. Roche stated that he also saw Ortiz reaching for the gun that Ortiz had put by the Maxima's front tire. Roche said that was when he shot Ortiz. Roche claimed that Ortiz was crouching or leaning over when he shot him.

Police crime scene specialists processed the scene. They collected Roche's .45-caliber pistol and a fired .45 casing from the parking lot near the Maxima. They

6

also collected an unloaded .22-caliber rifle from the ground, near the car's front driver's side tire and an unloaded .22-caliber pistol from inside the car on its front passenger seat along with .22-caliber ammunition.

Roche was charged with the murder of Ortiz under subsections 19.02(b)(1) and 19.02(b)(2) of the Penal Code. Under these subsections, a person commits the offense of murder if he intentionally or knowingly causes another's death or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PEN. CODE § 19.02(b)(1),(2).

At trial, the State's evidence depicted the events surrounding the shooting as described above. The State argued that Roche had intentionally shot Ortiz, not because he reasonably believed that Ortiz was about to use deadly force against Dennis, but because Ortiz had pushed Dennis, making him fall. The evidence included the testimony of Ortiz's four friends—Mendoza, Tirado, Hargrove, and Vindou—who witnessed the shooting. In conjunction with the testimony, the State introduced the videos filmed by Tirado and Vindou on their cell phones, which showed some of the events surrounding the shooting.

Ortiz's neighbor, Nina, who called 9-1-1 and witnessed the shooting, also testified. That night, Nina's kids had alerted her that there was a man outside with a gun. She went outside and saw that Roche had "lined up [Ortiz and his friends] against the car and he was pointing the gun at their heads." She then saw Roche

7

chasing them around the car. She said, "if the boys ran one way, he would turn around and run the opposite way and make them come back the other way." Nina then saw Dennis approach. She heard Ortiz say to Dennis, "Really, Dennis, you're going to let your son kill me? Really? I thought you were better than that. You been knowing us your whole life. You going to just let him shoot me and kill me?" Nina testified that Dennis grabbed Ortiz by the neck and "was just rushing [Ortiz], like shoving him." She said that after Dennis grabbed Ortiz's neck, Ortiz pushed Dennis and he fell. Nina saw "a flash" coming from Roche's hand, and Oritz fell to the ground.

Besides Nina's testimony, the State's evidence included a recording of Nina's 9-1-1 call in which she described what she had observed. Roche's 9-1-1 call was also admitted into evidence.

In addition, the State's evidence included the testimony of the police officer to whom Roche gave a statement at the scene, the testimony of the detective who interviewed Roche at the police station, and the videos of the on-scene statement and the interview. The crime scene specialists also testified, and the evidence they collected, including photographs from the scene, were admitted into evidence.

Dr. L. Edelman of the Travis County Medical Examiner's Office testified about the findings made from Ortiz's autopsy. The autopsy showed that a gunshot wound to the chest had caused Ortiz's death. The bullet had entered the right side of

Ortiz's chest and exited the left side of his chest. The trajectory of the bullet had been upwards through the chest, with the exit wound roughly three inches higher than the entry wound. Dr. Edelman indicated that Ortiz's injuries were more consistent with his right arm being raised than with his arm being by his side when he was shot.

The State presented evidence that it had obtained a subpoena for Dennis to testify. However, the State could not locate him, and he did not testify.

At trial, the defense argued that Roche was justified in shooting Ortiz because he reasonably believed that Ortiz would imminently use deadly force against Dennis. Roche testified in his own defense, describing the events surrounding the shooting.

On direct examination, Roche stated that Ortiz and his friends were setting off large fireworks in the parking lot, which was upsetting Dennis's service dog. Roche had been at his father's apartment painting doors to take to a job he had been hired to do for a bar in downtown Austin. After painting the doors, he had planned to install them later that night after the bar closed.

Roche testified that he had walked over to tell Ortiz and his friends "[to] knock it off" or "go somewhere else." He approached Ortiz because he knew him as Dennis's neighbor. He testified that he had a concealed handgun license, and he had his gun in the pockets of the shorts he was wearing. Roche stated that he asked the group to "knock it off" and "take it up the street." He denied that he referred to Ortiz

and his friends as "monkeys" or used the N-word when addressing them. And he denied threatening them in any way.

According to Roche, a shouting match then ensued between him and Ortiz and his friends. Ortiz indicated to Roche that he could not tell them what to do because he did not live there. Roche said he shouted at them to "quit popping fireworks." Roche stated that he went back to his truck and continued to paint the doors. He said that Ortiz continued yelling at him from a distance.

Roche went to his father's apartment where he showered and got ready for work. While he was in the apartment, he heard three more large fireworks being popped. He got dressed in a t-shirt and khaki pants and had his gun in a holster. Roche decided to again tell Ortiz and his friends to stop shooting fireworks before he left for work. Roche acknowledged that he was angrier the second time he approached the group. He said that he approached Ortiz and told him "[to] knock it off" and "quit the shit."

Roche claimed that Ortiz took a swing at him, which he blocked, and they ended up in a "wrestling match" on the passenger side of the Maxima. Roche said that he tore Ortiz's shirt during the struggle. Ortiz ran around to the passenger side of the car. Roche said that Ortiz's four friends were "circling around" and "coming at" him. Roche specified that Vindou was "aggressively coming at [him]." He claimed that Vindou then said, "I got something for you" and reached into his

10

waistband. Roche stated that was when he (Roche) first pulled out his gun. He testified that, although he never saw a gun, he believed that Vindou had a gun in his waistband. Roche acknowledged that he pointed his gun at Ortiz and his friends at that time.

Roche testified that Ortiz asked Mendoza to unlock the Maxima. Ortiz reached into the driver's-side back door of the car. Roche thought Ortiz was reaching for a gun, so he pointed his gun at Ortiz and told him to get his hands out of the car. Ortiz removed his hands from the car, and Roche put his gun back in its holster. Roche started to walk away, and Ortiz challenged Roche to fight him without a gun. During his testimony, Roche admitted that, at that point in the events of the night, he had called Ortiz a "monkey," but he claimed that he had not used the word as a racial slur. However, he acknowledged, "Hindsight being 20/20, I can see it's not the thing to call a black person, yes."

Roche stated that he then saw Ortiz come around the front of the Maxima with a gun. Roche pointed his gun at Ortiz and told him to drop it. Roche testified that Ortiz put the gun on the ground on the driver's side in the middle of the car. Roche then walked away again with his gun by his side. As he walked away, he believed that he heard Ortiz say to Dennis, "Come get your son, Mr. Dennis, before you get killed." Roche testified that he understood the statement to be a threat to kill his father.

Roche then chased Ortiz around the Maxima. He said that he told Ortiz that he would fight him. Roche testified that, as Dennis approached the scene, he saw Ortiz grab another gun from the driver's side backseat of the car. Roche said he told Ortiz to put the gun down. Ortiz put the gun on the ground near the back of the car on the driver's side. Roche claimed that, at that point, there were two guns on the ground on the driver's side of the car.

Dennis walked up to the group on the driver's side of the car. Roche said that he was focused on Vindou and another friend who were behind Dennis, and he told them "[to] get off [his] dad's back." Out of his peripheral vision, he saw Ortiz make a hitting motion toward Dennis and then saw Dennis fall to the ground. Roche testified that he saw Ortiz pick up a gun and point it at Dennis. Roche then shot Ortiz because he believed Ortiz would shoot Dennis.

After the shooting, Roche went to check on Dennis. Roche said Ortiz was lying on the ground at the back of the car. He testified that he saw one of Ortiz's friends run towards Ortiz, pick up an object, and run around to the passenger side of the car, implying by his testimony that the person had moved the gun Roche claimed he had seen Ortiz pointing at Dennis when he shot Ortiz. Roche also testified that Vindou moved the first gun that Ortiz had placed on the ground, moving it from the middle of the Maxima to near the front tire, where it was located when the police arrived.

When cross-examining him, the State pointed out inconsistencies between statements Roche had made to the police immediately following the shooting and his testimony on direct examination. For instance, the State asked Roche to acknowledge that his testimony on direct examination was the first time he had ever said that Vindou reached to his waistband and said, "I got something for you." At first, Roche acknowledged that he had not previously told anyone that information but then stated that he did not remember whether he conveyed that information to the police officer at the scene. Roche stated that he would need to see the video of his statement.

The State pointed out that, regarding the first gun Roche said Ortiz displayed, Roche told police that Ortiz had put the gun on the ground near the Maxima's front tire, even though he testified on direct examination that Ortiz had placed the gun on the ground in the middle of the car and that Vindou had moved the gun to near the front tire after Ortiz was shot. Answering the State's questioning, Roche stated that he told the police that it was near the front tire because that was where they would find it. Roche also acknowledged on cross-examination that the first time he had mentioned that Ortiz had a second gun was six months after the shooting when he was interviewed by a local news station.

In the charge, the jury was instructed on Roche's defensive theory of defense of a third person. The jury rejected the defense and found Roche guilty of murder.

During the punishment phase, the trial court admitted—over Roche's objection—evidence of his affiliation with the Los Güeros Motorcycle Club, a support club for the Bandidos Motorcycle Club, a large outlaw motorcycle gang in Texas with a reputation for violence. In the punishment charge, the jury was given a special issue requiring it to determine whether Roche caused Ortiz's death "under the immediate influence of sudden passion." *See Kitchens v. State*, No. 01-18-00518-CR, 2019 WL 6482408, at *9 (Tex. App.—Houston [1st Dist.] Dec. 3, 2019, pet. ref'd) (mem. op., not designated for publication) ("A sudden-passion jury finding in the punishment phase reduces the first-degree felony offense of murder to a second-degree felony, which carries a punishment range of two to twenty years.") (citing TEX. PENAL CODE §§ 12.33(a), 19.02(d).)). The jury made a negative finding on the special issue of sudden passion and assessed Roche's sentence at 43 years in prison. This appeal followed with Roche raising two issues.

## Sufficiency of the Evidence

In his second issue, Roche contends that the evidence was legally insufficient to support the jury's rejection of his claim that his conduct of shooting Ortiz was justified by the law of defense of a third person.[2]

---

[2] We begin with Roche's second issue challenging the sufficiency of the evidence supporting his conviction because, if meritorious, it is the ground affording him an acquittal, the greatest possible relief. *See Davis v. State*, 413 S.W.3d 816, 820 (Tex. App.—Austin 2013, pet. ref'd) ("We begin by reviewing the sufficiency of the evidence supporting [appellant's] conviction, the appellate ground potentially

## A.    Law of Self-Defense and Defense of Third Party

The Penal Code provides that deadly force used in self-defense or in defense of another is a defense to prosecution for murder if that use of force is "justified." *See* TEX. PENAL CODE §§ 9.02 ("It is a defense to prosecution that the conduct in question is justified under this chapter."), 9.31–9.33 (listing requirements for establishing claim of self-defense or defense of third person).

Penal Code section 9.31 provides that, subject to certain exceptions, a person is justified in using force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). The use of force is not justified in response to verbal provocation alone, or if the actor provoked the other's use or attempted use of unlawful force. *Id.* § 9.31(b). A "reasonable belief" in this context is defined as one "that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42).

A person is justified in using deadly force against another (1) if he would be justified in using force against the other under section 9.31, and (2) "when and to the degree the actor reasonably believes the deadly force is immediately necessary:

---

affording him an acquittal, the greatest possible relief."); *Price v. State*, 502 S.W.3d 278, 281 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("We address appellant's second issue first because it challenges the sufficiency of the evidence and seeks rendition of a judgment of acquittal.").

(A) to protect the actor against the other's use or attempted use of unlawful deadly force, or (B) to prevent the other's imminent commission of . . . murder. . . ." *Id.* § 9.32(a). The actor's belief that the deadly force was immediately necessary is presumed to be reasonable under certain circumstances, including that the actor "knew or had reason to believe that the person against whom the deadly force was used" was committing or attempting to commit one of several enumerated serious felony offenses, including murder, and that the actor did not provoke the person against whom the force was used and was not otherwise engaged in criminal activity, other than a Class C misdemeanor traffic violation. *See id.* § 9.32(b).

Regarding defense of a third person, a person is justified in using deadly force against another to protect a third person if: (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under section 9.32 in using deadly force to protect himself against the unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and (2) the actor reasonably believes that his intervention is immediately necessary to protect the third person. *Id.* § 9.33; *Henley v. State*, 493 S.W.3d 77, 89 (Tex. Crim. App. 2016) ("[A] defendant is justified in defending a third person if, under the circumstances as the defendant reasonably believes them to be, the third person would be justified in defending himself.").

16

**B.     Standard of Review**

In evaluating a claim of insufficient evidence in the context of a justification defense, we apply general sufficiency review principles in conjunction with sufficiency review principles specific to justification. *See Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018); *see Watts v. State*, No. 01-19-00804-CR, 2020 WL 6163832, at *5 (Tex. App.—Houston [1st Dist.] Dec. 9, 2020, pet. ref'd) (mem. op., not designated for publication). Under general principles governing legal sufficiency review, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979)). This familiar standard "recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence." *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). "On review, this Court determines whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all the evidence." *Id.* We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 917 (Tex. Crim. App. 2010). As a reviewing court, we may not reevaluate the weight and credibility of the

17

evidence in the record and thereby substitute our own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

When a defendant raises a claim of self-defense or defense of a third party to justify the use of force against another, "the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues." *Braughton*, 569 S.W.3d at 609 (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991)). The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue. *Braughton*, 569 S.W.3d at 609 (citing *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013)). By contrast, the State's burden of persuasion "is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt." *Id.* at 608–09 (citing *Zuliani*, 97 S.W.3d at 594). Thus,

> [i]n resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's [evidence of a justification defense], but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the [justification]-defense issue beyond a reasonable doubt.

*Id.* at 609 (quoting *Saxton*, 804 S.W.2d at 914).

18

Further, the trier of fact is the sole judge of the credibility of defensive evidence, and it is free to accept it or reject it. *Id.*; *Saxton*, 804 S.W.2d at 914. Ultimately, a justification defense is a fact issue that is determined by the jury, and "[a] jury verdict of guilty is an implicit finding rejecting the defendant's [justification]-defense theory." *Braughton*, 569 S.W.3d at 609 (quoting *Saxton*, 804 S.W.2d at 914); *Zuliani*, 97 S.W.3d at 594.

## C.    Analysis

Roche does not challenge the sufficiency of the evidence to support the essential elements of his murder conviction. Instead, he asserts that no rational juror could have found beyond a reasonable doubt that he did not reasonably believe that the use of deadly force was immediately necessary to protect Dennis from Ortiz's use or attempted use of unlawful force against Dennis.

Roche's defensive claim at trial that he shot Ortiz to prevent him from shooting Dennis hinged almost entirely on the credibility of Roche's testimony versus the credibility of the State's witnesses to the shooting. The jury was presented with conflicting versions about what had happened that night, specifically whether Ortiz was pointing or reaching for a gun at the time Roche shot him. Ultimately, the jury had to decide Roche's guilt based on whether it found the defense's version or the State's version more credible.

Generally, the defense's version of the events were as follows: (1) Ortiz and his friends were verbally aggressive toward Roche when he initially asked them to stop shooting fireworks in the parking lot; (2) after changing his clothes to go to work and putting on his gun in its holster, Roche returned to the group a second time because the fireworks continued; (3) when he approached the group, Ortiz swung at him and a struggle ensued between them; (4) Roche saw Ortiz's friends gathering around him; (5) Roche saw Vindou reach toward his waistband and heard him say, "I got something for you"; (6) fearing for his safety, Roche drew his gun and pointed it at Ortiz and his friends; (7) Ortiz asked Mendoza to unlock the Maxima and reached into the car; (8) Roche told Ortiz to remove his hands from the car, and he did (9) Roche holstered his gun and began to walk away when he saw Ortiz come around the front of the Maxima with a gun; (10) Roche pointed his gun at Ortiz and told him to drop it, and Ortiz placed the gun on the ground on the driver's side in the middle of the car; (11) Roche again started to walk away when he thought he heard Ortiz threaten Dennis, and Roche walked back the group; (12) as Dennis approached the scene, Ortiz grabbed another gun from the driver's side backseat of the car, and Roche told him to put the gun down; (13) Ortiz put the gun on the ground near the back of the car on the driver's side; (14) at that point, there were two guns near the car on the ground; (15) Roche was focusing his attention on Vindou and another person when he saw Ortiz make a hitting motion toward Dennis and saw Dennis fall

20

to the ground; (16) Roche saw Ortiz pick up a gun and point it at Dennis; (17) Roche shot Ortiz because he thought Ortiz was about to shoot Dennis; (18) Ortiz was crouched or leaned over when he was shot; (19) Roche saw someone pick up the gun from the back of the car and go around to the passenger side of the car with it; and (20) Roche saw Vindou move the gun that was on the ground in the middle of the car to near its front tire.

In contrast, the State's version of the events were generally as follows: (1) when he initially approached Ortiz and his friends to tell them to stop shooting fireworks, Roche yelled, was rude, and used racial slurs; (2) after changing his clothes and putting his gun in its holster, Roche returned to the group, appearing more angry and aggressive than the first time; (3) Roche walked up to Ortiz and either grabbed or punched him, and Ortiz swung at Roche; (4) there was a scuffle, and Roche tore Ortiz's shirt off his body; (5) Ortiz's friends stepped forward to help Ortiz; (6) Roche pulled his gun from its holster, pointed it at the group, and then held it to Vindou's forehead, telling him, "If you take another step I will shoot, you black son of a bitch," but Vindou never reached into his waistband for a gun or threatened Roche; (7) Roche pointed the gun at each of the young men lined up against the Maxima; (8) Roche began walking away, and Ortiz took a gun from the Maxima but did not point it Roche; (9) Roche pointed his gun at Ortiz who placed his gun by the Maxima's front, driver's-side tire; (10) as Roche walked away, Ortiz shouted to

21

Dennis that he should "get your son before he gets killed," which Roche misheard as a threat to his father; (11) Roche then chased Ortiz around the Maxima; (12) Dennis arrived at the scene and began pushing Ortiz and putting his hands in Ortiz's face; (13) Dennis and Ortiz were near the back, driver's side of the Maxima; (14) Dennis grabbed Ortiz around his neck, choking him; (14) Ortiz pushed Dennis, and Dennis fell to the ground; (15) Roche took a couple of steps toward Ortiz and fired his gun with the bullet striking Ortiz in his chest; (16) Ortiz was neither reaching for a gun nor pointing a gun at Dennis when Roche shot him; rather, he was turning to his left to run away, as supported by witness testimony and the autopsy report; (17) Ortiz never had a second gun at the scene, as claimed by Roche; (18) the only gun Ortiz displayed was the gun he had before Dennis arrived at the scene and which Ortiz put on the ground near the front tire; that gun was never in the middle of the car; and (19) Roche shot Ortiz because Ortiz pushed Dennis, not because Roche saw Ortiz point a gun at Dennis.

As discussed, Roche's contention, both at trial and on appeal, appears to be that he reasonably believed deadly force was immediately necessary because Ortiz was about to use of deadly force against Dennis. Roche primarily relies on his own testimony that Ortiz pushed Dennis to the ground, grabbed a gun, and pointed it at Dennis, which prompted him to shoot Ortiz to protect Dennis. But, by its implicit rejection of Roche's defense in finding him guilty, the jury necessarily signaled its

disbelief in his testimony, finding it lacking in credibility. The legal sufficiency standard does not permit us to substitute our view of the credibility of the witnesses' testimony for that of the jury. *See Braughton*, 569 S.W.3d at 611 (citing *Saxton*, 804 S.W.2d at 913–14 (recognizing assessment of credibility of defensive evidence is "solely within the jury's province and the jury is free to accept or reject the defensive evidence"; "[a] jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory")).

We acknowledge "that these principles affording deference to the jury's credibility determinations are not without limits." *Id.* "A jury's decision to reject witness testimony must be rational in light of the totality of the record, and any underlying inferences used to reject that testimony must be reasonable based upon the cumulative force of all of the evidence." *Id.* (citing *Adames*, 353 S.W.3d at 860). "[A] jury is not permitted to disregard undisputed objective facts that can support only one logical inference." *Id.* (citing *Brooks*, 323 S.W.3d at 907). Here, however, Roche does not point to any aspect of the record that would render the jury's credibility determinations irrational considering these principles. To the contrary, there is sufficient evidence in the record to rationally support the jury's rejection of Roche's version of the events surrounding the shooting and to support the State's version. *See id.*; *Saxton*, 804 S.W.2d at 913–14.

The State's witnesses who saw the shooting testified that Dennis grabbed Ortiz's neck and was choking him, prompting Ortiz to push him. Ortiz's four friends—Mendoza, Tirado, Hargrove, and Vindou—testified that Ortiz did not have a gun in his hands when Roche shot him. On the cell phone videos, before he is shot, Ortiz can be heard yelling, "This [N-word] [referring to Dennis as the N-word] just choked . . . ." Ortiz's statement is then suddenly cut off by Roche firing his gun, and Ortiz does not finish the statement. Only two to three seconds elapsed between Ortiz pushing Dennis and Roche shooting Ortiz. Ortiz's friends testified that, after Ortiz pushed Dennis, Ortiz had turned to his left, and was trying to run away from Roche.

Ortiz's autopsy report showed that the bullet had entered the right side of Ortiz's chest and exited the left side of his chest. The trajectory of the bullet was upwards through the chest, with the exit wound roughly three inches higher than the entry wound. Dr. Edelman of the medical examiner's office indicated in her testimony that Ortiz's injuries were more consistent with his right arm being raised than with his arm being by his side when he was shot. The State pointed out that these findings were consistent with Ortiz turning to his left to run as he was shot and not consistent with him crouching down or leaning over to pick up a gun when he was shot as Roche claimed.

Evidence collected at the scene also supported the State's theory of the case. The police's crime scene specialists found a gun on the ground near the Maxima's

24

front, driver's-side tire where Mendoza testified that Ortiz had laid it. The evidence showed that, when he was shot, Ortiz was near the back, driver's side of the Maxima, not the front. No other gun was found on the ground near the Maxima.

In addition, Roche was impeached with contradictions between his trial testimony and his statements immediately following the shooting. Roche testified that Ortiz had placed the gun that was recovered near the front tire in the middle of the car, not by the front tire. Roche claimed that, after the shooting, he saw Vindou move the gun from the middle of the car to near the front tire. However, in his recorded statement at the police station, given to the detective immediately after the shooting, Roche stated more than once that Ortiz had placed the gun on the ground near the front tire. He never said that Ortiz had placed the gun in the middle of the car.

At trial, Roche claimed that Vindou had reached into his waistband and said, "I got something for you," but Roche omitted that information when he made his statements to the police both at the scene and at the police station. Roche testified that Ortiz had gotten a second gun from inside the Maxima and had laid it on the ground near the back of the Maxima, which was closer to where Ortiz was when he was shot. However, Roche acknowledged at trial that the first time that he had mentioned that Ortiz had a second gun was six months after the shooting when he did an interview with a local news station. At the police station, the detective

specifically asked Roche if there had been any other guns besides the one Ortiz laid by the front tire, and Roche expressly said that there were no other guns.

On appeal, Roche points out that the evidence showed that he was concerned for his father's safety. In his brief, he indicates that it was reasonable for him to believe that force was about to be used against Dennis simply because Dennis had been pushed to the ground and there had been an ongoing altercation with Ortiz and his friends. But that was not what Roche claimed at trial. He testified that he shot Ortiz because Ortiz had picked up a gun and was pointing it at Dennis, which the jury was free to disbelieve. And the jury could have rationally found that shooting Ortiz because he pushed Dennis was not immediately necessary to protect Dennis. *See* TEX. PENAL CODE §§ 9.31(a), 9.33; *see also Lopez v. State*, Nos. 02-11-00427-CR, 02-11-00428-CR, 02-11-00429-CR, 2013 WL 1457745, at *5 (Tex. App.—Fort Worth Apr. 11 2013, pet. ref'd) (mem. op., not designated for publication) (holding evidence sufficient to uphold rejection of defense-of-third-person theory in aggravated assault case when threat of force not immediately necessary to protect third party); *Stoltz v. State*, No. 08-10-00048-CR, 2011 WL 3199337, at *11 (Tex. App.—El Paso July 27, 2011, pet. ref'd) (not designated for publication) (affirming jury's rejection of self-defense and necessity defenses when defendant's testimony indicated "a potential circumstance which [defendant] anticipated would happen," rather than "an existing circumstance requiring immediate action").

Viewing the evidence in the light most favorable to the jury's verdict, we hold that the State offered sufficient evidence from which a rational jury could have found beyond a reasonable doubt against Roche on his claim of defense of a third party. We overrule his second issue.

**Evidence of Gang Affiliation**

In his first issue, Roche contends that the trial court abused its discretion when it admitted evidence regarding his motorcycle gang affiliation during the punishment phase of trial.

**A.      Summary of Evidence**

When the State called Detective P. Kovach of the Austin Police Department's Gang Suppression Unit to testify during the punishment phase about Roche's gang affiliation, Roche objected that his testimony was "not relevant and it's unfairly prejudicial on top of that. It's [Rules] 401, 403, and 404." The State responded that Detective Kovack had "personal knowledge of this defendant being documented as a gang member" because he "had researched the documentation." A voir dire examination was then conducted of Detective Kovack outside the presence of the jury. At the end of the examination, Roche again objected to Kovack's testimony. The trial court overruled the objection, permitting Detective Kovack to testify. Roche requested and obtained a running objection to Detective Kovack's testimony.

Detective Kovack testified that the duties of the officers in the Gang Suppression Unit include investigating gang-related crime and documenting gang members. Detective Kovack stated that, to document someone as a gang member, that person must meet certain criteria outlined in the Texas Code of Criminal Procedure. The gang membership documentation is maintained by the Texas Department of Public Safety in a database known as "TxGANG." If no further criminal activity is committed by the person, an adult documented as a gang member remains in the database for five years.

Detective Kovack testified that he had searched TxGANG and determined that, in August 2017, Roche was documented as being a member of the Los Güeros Motorcycle Club. He explained that "the Los Güeros is an identified . . . outlaw motorcycle club and gang within Texas," and they are a support club of the Bandidos Motorcycle Club, a larger gang. Detective Kovack testified that "the Bandidos are the largest outlaw motorcycle gang within the state of Texas" and have been "in and out of law enforcement contact for numerous racketeering charges, et cetera, throughout the history of the gang." He stated that the Bandidos's "reputation in the community is for being violent." Detective Kovack testified that the Bandidos have had "numerous confrontations" with "law enforcement" with "violent encounters" occurring "throughout the history of the gang."

Detective Kovack explained that support motorcycle clubs—such as the Los Güeros Motorcycle Club—"are other smaller motorcycle clubs that will align themselves with the Bandidos." Detective Kovack testified that the Bandidos "use support clubs to facilitate criminal activity and legitimate activity." He stated that support clubs will "attend functions with [the Bandidos]. They'll attend their monthly meetings. The Bandidos will utilize [the support clubs] as—in addition to, number one, as kind of to plus-up their numbers, to assist with legitimate as well as illegal activities that the club needs help with." Detective Kovack also explained that the Bandidos often "recruits its full-time members from members of their support clubs."

Detective Kovack was shown three photographs of tattoos on Roche's forearm. The photos had previously been admitted into evidence without objection. One tattoo was for the Roadsiders, another Texas motorcycle club. Detective Kovack said that the Roadsiders were not a support club for the Bandidos, but they did hold functions attended by the Bandidos.

The photographs showed that Roche had another tattoo depicting the number "13" inside a diamond shape with the words "moto cicleta" (Spanish for motorcycle) underneath the 13. According to Detective Kovack, "[t]he number 13 is commonly used within outlaw motorcycle gangs to affiliate themselves with the outlaw lifestyle." He explained that "[t]he 13 represents the 13th letter of the alphabet,

29

which is M. Typically that can be associated with several different meanings, depending on how it's represented. Sometimes it can be for, obviously, motorcycle. The other ones it can be associated with are for marijuana and the illegal drug methamphetamine." He said that "it can also be used to pay homage to that individual's parent gang."

Detective Kovack also testified about the coloring of the tattoo, which he characterized as being "significant." The photograph showed that the "13" was in gold lettering on a red background. He stated that the Bandidos's "colors" are "a gold background with red lettering." Detective Kovack explained that the support clubs "use the inverted colors to show affiliation with the Bandidos, which is gold lettering over a red background." He testified that Roche's tattoo had "a red background with gold lettering over the top of it," which indicated to him that Roche was showing, "not only being affiliated with the outlaw code and the outlaw motorcycle lifestyle, [but also showed his] affiliation with the Bandidos." He explained that individuals who have such tattoos want to affiliate themselves "for life or a long period of time" with the gang, and "they will typically tattoo that gang's colors on their body to let everybody know" of the affiliation." Detective Kovack observed that Roche's tattoo was on his forearm, "which is in a very public area where it would be seen" and "not easily hidden by clothing."

The State also showed Detective Kovack two photographs of the black t-shirt Roche was wearing when he was detained at the scene and two screen shots taken from the responding police officer's body camera footage recorded when Roche gave his on-scene statement. The body camera video had already been admitted during the guilt-innocence stage. The cell phone video admitted during the guilt-innocence stage also showed that Roche was wearing the black t-shirt when he shot Ortiz.

The back of the t-shirt had the phrases "Support Your Local Bandidos" and "Nomad Approved." Detective Kovack testified that "nomad" is "a term used within the Bandidos Outlaw Motorcycle gang as an individual that does not show specific affiliation with any chapter." He stated that the phrase "Support Your Local Bandidos" is significant because "the Bandidos are proud of their branding," and the shirt would be obtained "by somebody that wants to show support for the club." The back of the t-shirt also had an image of a skull with two crossed pistols and a gun belt and the words "Malicious Intentions." The front of the shirt also had the phrases "Malicious Intentions" and "Nomad Approved." Detective Kovack pointed out that the lettering on the shirt was "gold and red which is the significant colors that signify the Bandidos."

**B. Standard of Review**

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). Under this standard, we may reverse the trial court only if its decision lies outside the zone of reasonable disagreement. *Id.* at 83. An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016).

**C. Analysis**

*1. Relevance*

On appeal, Roche asserts that the trial court erred in admitting evidence of his gang affiliation during the punishment phase because it was not relevant.[3] Rule of Evidence 401 provides: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is

---

[3] In a single sentence Roche also states that "[i]ndividuals should not be prohibited from freedom of association." However, Roche did not make this objection in the trial court, and it is therefore not preserved. *See* TEX. R. APP. P. 33.1(a); *see also Brown v. State*, No. 04-0700626-CR, 2008 WL 3862137, at *1 (Tex. App.—San Antonio Aug. 20, 2008, pet. ref'd) (mem. op., not designated for publication) (holding that appellant waived objection that evidence of gang affiliation violated his constitutional right of association because he did not raise objection in trial court). We also note that Roche failed to provide substantive argument or cite authorities in support of this statement. *See* TEX. R. APP. P. 38.1(i) (stating that an appellant's "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities"); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (holding appellant waives issue on appeal if he does not adequately brief that issue by presenting supporting arguments and authorities).

of consequence in determining the action." TEX. R. EVID. 401. The Court of Criminal Appeals discussed the role of the trial court in determining relevance as a threshold matter:

> Determining the relevance of any given item of evidence to any given lawsuit is not exclusively a function of rule and logic. The trial court must rely in large part upon its own observations and experiences of the world, as exemplary of common observation and experience, and reason from there in deciding whether proffered evidence has "any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence." The determination of relevance, vel non, thus depends upon one judge's perception of common experience. The process cannot be wholly objectified.

*Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).

"These observations ring particularly true in the punishment context, where 'there are no distinct "facts . . . of consequence" that proffered evidence can be said to make more or less likely to exist.'" *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018) (quoting *Ellison v. State*, 201 S.W.3d 714, 718–19 (Tex. Crim. App. 2006)). "Inevitably, deciding what punishment to assess is a normative process, not intrinsically factbound." *Id.* (internal quotation marks omitted).

But even so, "the Rule-401 concept of relevance has been incorporated into Article 37.07, Section 3(a) of the Code of Criminal Procedure, which 'governs the admissibility of evidence during the punishment stage of a non-capital criminal trial.'" *Id.* (quoting *McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007)). Article 37.07, Section 3(a)(1) provides that, during the punishment phase, a trial

court may admit evidence "as to any matter [it] deems relevant to sentencing," including the defendant's character.[4] TEX. CODE CRIM. PROC. art. 37.07, § 3(a)(1). Generally, "evidence is 'relevant to sentencing,' within the meaning of the statute, if it is 'helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case.'" *Beham*, 559 S.W.3d at 478 (quoting *McGee*, 233 S.W.3d at 318).

"As a general matter, testimony regarding a defendant's affiliation with a gang may be relevant and admissible at the punishment phase to show the defendant's character." *Mitchell v. State*, 546 S.W.3d 780, 789 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (quoting *Garcia v. State*, 239 S.W.3d 682, 866–67 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd)). Further, "[p]resent or past gang affiliation is

---

[4] In his brief, Roche cites former Rule of Criminal Evidence 404(c) as support for his relevancy complaint. The Court of Criminal Appeals has explained: "Prior to 1998, Rule 404(c) of the Texas Rules of Evidence discussed the use of character evidence during the punishment phase. However, the Legislature deleted Rule 404(c) in 1998, leaving Article 37.07 of the Code of Criminal Procedure to govern the admission of evidence in a non-capital felony trial" during the punishment phase. *Sims v. State*, 273 S.W.3d 291, 295 (Tex. Crim. App. 2008). Roche also cites Rule of Evidence 404(b) in support of his relevancy complaint. Rule 404(b) prohibits the admission of extraneous-offense evidence at the guilt-innocence phase of a trial to prove that a defendant committed the charged offense in conformity with bad character. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011) (citing TEX. R. EVID. 404(b)). We have noted that a "Rule 404(b) admissibility analysis . . . operates separately from [an] analysis of relevancy and admissibility for the punishment phase of trial under article 37.07, section 3(a)(1)." *Burks v. State*, 227 S.W.3d 138, 150 n.8 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). Thus, neither former Rule of Evidence 404(c) nor Rule 404(b) apply or assist in determining whether the gang-affiliation evidence was admissible here.

evidence of [the defendant's] character, and he need not still be affiliated with the gang for the evidence to be relevant and admissible during the punishment phase." *Id.* (citing *Ho v. State*, 171 S.W.3d 295, 305 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd)); *see Beham*, 559 S.W.3d at 478 ("[E]vidence that the defendant is an active member of a gang that regularly engages in criminal activities . . . is almost always relevant for sentencing purposes.").

The Court of Criminal Appeals has made clear that "[t]here is not . . . a quantum of proof that must be met with respect to a person's character before it may be considered by the jury in reaching a just punishment." *Beham*, 559 S.W.3d at 483. "The only standard in this area is that of relevance: Does this character evidence contribute, even incrementally, to the jury's legitimate normative response to the defendant?" *Id.*

Here, Roche's documented affiliation with the Los Güeros Motorcycle Club, along with evidence of its connection with the Bandidos, informed "a legitimate area of normative inquiry" for the jury with respect to Roche's character. *See id.* at 480. Detective Kovack testified that Roche was documented in the DPS database in August 2017 as a member of the Los Güeros, a support club for the Bandidos, a larger motorcycle club. Detective Kovack testified that the Bandidos are an "outlaw" motorcycle gang with a known history of criminal activity and violence, including "numerous confrontations" with law enforcement involving "violent encounters."

35

The evidence showed that Roche had a Los Güeros tattoo on his lower forearm that was comprised of the Bandidos's colors of gold and red. At the time he shot Ortiz, Roche was wearing a t-shirt that prominently stated, "Support Your Local Bandidos." Detective Kovack testified that Roche's tattoo and t-shirt represented someone "flying his colors," a phrase meaning that he was wearing the gang's colors to demonstrate his pride in his gang affiliation.

Roche points out that Detective Kovack indicated in his testimony that he did not know how the Los Güeros specifically supported the Bandidos's criminal activity, and he stated that he was not the person who had personally identified the Los Güeros as a criminal gang or set up their documentation in the DPS database. However, Detective Kovack testified that because it had been entered into the DPS's TxGANG database, the Los Güeros had satisfied the Code of Criminal Procedure's required criteria to be designated a "criminal street gang" and had been identified as a support club for the Bandidos. Detective Kovack testified that, although he was not an expert on motorcycle clubs specifically, through his training and experience as an officer in the Austin Police Department's Gang Suppression Unit, he was familiar with motorcycle clubs. His testimony also demonstrated that he was knowledgeable about the criteria and process for identifying and documenting gangs and gang member in Texas. *See Jackson v. State*, No. 05-13-00579-CR, 2014 WL 3955171, at *3 (Tex. App.—Dallas Aug. 14, 2014, no pet.) (mem. op., not

designated for publication) (overruling challenge to admissibility of officer's testimony regarding gang membership because officer lacked personal knowledge). Detective Kovack explained that the Bandidos use support clubs—such as the Los Güeros—not only to increase its numbers and for recruitment but "to facilitate criminal activity."

We conclude that the gang-affiliation evidence was, under the circumstances, relevant to Roche's character for purposes of punishment. The evidence informed "a legitimate area of normative inquiry," and the trial court was within its discretion to determine that the evidence was relevant to sentencing. *See Beham*, 559 S.W.3d at 480.

### 2.    *Rule 403*

Roche also complains that the admission of the gang-affiliation evidence violated Rule of Evidence 403, which provides that otherwise relevant evidence may be inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403. The rule "favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). A Rule 403 analysis must balance (1) the inherent probative force of the proffered item of evidence, along with (2) the proponent's need for that evidence, against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any

tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

"The first factor looks to the evidence's probativeness or how compellingly the evidence serves to make a fact of consequence more or less probable." *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005). Here, the evidence showed that Roche was a documented member of the Los Güeros, a support club for the Bandidos, a motorcycle gang with a reputation for violence, including violent encounters with law enforcement, which uses its support clubs to facilitate criminal activities. In short, the gang-affiliation was evidence of Roche's character, revealing his attitude toward violence and lawbreaking. Additionally, the evidence served to rebut Roche's testimony during the guilt-innocence phase in which he portrayed himself as non-violent and law-abiding, acting only to protect his father. *See McDade v. State*, 613 S.W.3d 349, 355–56 (Tex. App.—Dallas 2020, no pet.) (overruling challenge to admission of punishment evidence showing defendant held himself out as involved in gang activity because evidence was probative of defendant's character and rebutted testimony about defendant's good character).

38

Thus, the trial court could have reasonably determined that the probative value and need for the evidence weighed in favor of admissibility.

The trial court also could have determined that any tendency for the jury to assess punishment based an improper basis because of the admission of the gang-affiliation evidence was low. The evidence established that Roche had a gang affiliation with the Los Güeros and demonstrated his apparent admiration for the Bandidos, but the evidence did not suggest that Roch had committed any extraneous acts on behalf of either motorcycle gang. While it was probative of Roche's character, the gang-affiliation evidence, as presented, was "not so inflammatory as to tempt the jury into assessing punishment based solely on [it] in lieu of . . . the remaining evidence before the jury." *Id.*

Further, the trial court could have determined that the gang-affiliation evidence, which was relevant to Roche's character, was straightforward and of a subject matter that was easily understood. Thus, it was not the type of evidence that would confuse or distract the jury from assessing punishment for the offense of murder for which Roche had been found guilty. *Cf. Gigliobianco*, 210 S.W.3d at 641 (noting that scientific evidence is of type that "might mislead a jury that is not properly equipped to judge the probative force of the evidence").

Finally, regarding the amount of time required for the gang-affiliation evidence and whether it was repetitive, the record shows that entire trial lasted five

days with 25 witnesses testifying. Of these, ten witnesses testified during the punishment phase—five for the State and five for the defense. Detective Kovack was the only witness to testify about the gang-affiliation evidence, and his testimony comprised only 19 pages out of approximately 120 pages of testimony during the punishment phase. In the context of the entire trial and the relatively short time taken to address the gang-affiliation evidence, the record shows that the evidence was not repetitive, and it did not consume an inordinate amount of time.

When the factors are considered together, the trial court could have reasonably determined that the probative value of the gang-affiliation evidence outweighed any prejudicial effect. *See* TEX. R. EVID. 403. Given the standard of review, the presumption in favor of admissibility, and the resolution of the factors as discussed, we hold that it was within the trial court's discretion not to exclude, pursuant to Rule 403, evidence of Roche's gang affiliation. *See Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) ("[Rule 403] envisions exclusion of evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value.").

We overrule Roche's first issue.

**Conclusion**

We affirm the judgment of the trial court.


Richard Hightower
Justice

Panel consists of Justices Goodman, Hightower, and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).

41